In the Matter of the Accounting of S. SHELDON JUDSON et al., as Trustees under the Will of ELIZA L. ABLETT, Deceased.

Surrogate's Court, Oneida County, July 2, 1954.

*Judson & Cardamone* for trustees, petitioners.
*Arthur N. Gleason* for Camp Healthmore, Inc.

*Moses G. Hubbard* for Young Women's Christian Association, Inc., of Utica, N. Y., and another.

*Milton D. Nelson* for Central Association for the Blind, Inc.

*Bartle Gorman* and *Francis J. Finnegan* for Thomas A. Lissaman and others.

*Nathaniel L. Goldstein, Attorney-General* (*Thomas Burke* of counsel), for unknown beneficiaries.

*James Maxwell Fassett* for Board of Governors and The Governors of London Hospital of Whitechapel, London, England.

WILLIAMS, Special Surrogate. Eliza Lillian Ablett died a resident of the County of Oneida on September 22, 1931, leaving a last will and testament dated September 4, 1931, which was duly admitted to probate by the Surrogate's Court of Oneida County on December 21, 1931. By the terms of her will she made a number of bequests and the remainder of her estate was left in trust for the benefit of her stepbrother, James Vincent, of London, England. The will provided that after the death of her stepbrother a trust in the amount of $50,000 should be established for the benefit of the Robert Ablett Community House, and a bequest of $5,000 was given to the Stevens-Swan Humane Society of Oneida County. The will then provided for the distribution of the remainder of her estate as follows: " Seventeenth: Upon the death of James Vincent, and after the deduction of the above bequest, I direct my trustees to divide my residuary estate into five equal parts and to pay one of said parts to the London Hospital of Whitechapel, London, England, to be known as the Robert Ablett Memorial, the income of which is to be used for such purposes as the board of managers or directors may deem advisable; one part I direct my trustees to pay to the Young Women's Christian Association, Inc. of Utica, N. Y., to be known as the Robert Ablett Memorial, the income of which is to be used for such purposes as the board of managers or directors may deem advisable; one part thereof I direct my trustees to pay to the trustees or directors of the Door of Hope, Inc., 1020 Mathews Avenue, Utica, N. Y., to be known as the Robert Ablett Memorial, the income of which is to be used for such purposes as the board of managers or directors may deem advisable; one part thereof I direct my trustees to pay to Camp Healthmore, Inc. of Utica, N. Y., to be known as the Robert Ablett Memorial, the income of which is to be used for such purposes as the board of managers or directors may deem advisable; one part thereof

I direct my trustees to pay to the trustees or directors of the Central Association for the Blind, Inc., 32 Bank Place, Utica, N. Y., to be known as the Robert Ablett Memorial, the income of which is to be used for such purposes as the board of managers or directors may deem advisable.''

James Vincent died on December 20, 1951. This proceeding is an accounting of the trustees of the trust fund held for the benefit of James 'Vincent, which amounts to approximately $800,000, and this court has been asked for a direction as to the disposition of that portion of the remainder estate directed to be paid to '' the London Hospital of Whitechapel, London, England ''.

The request for direction was made in view of the fact that the Government of Great Britain, by the National Health Service Act of 1946, nationalized the hospitals in England, of which the London Hospital is one. Prior to the enactment of that act there was a hospital located in Whitechapel, London, England, commonly known and referred to as the London Hospital. This hospital still exists and is still commonly known and referred to as the London Hospital. The official corporate name of that hospital prior to the effective date of the National Health Service Act was '' The Governors of London Hospital ''. It was a charitable hospital supported primarily by voluntary contributions. Upon the effective date of the National Health Service Act, to wit: July 5, 1948, title to the hospitals in England was taken over by the English Government and governing boards and bodies were appointed for such hospitals. The official corporate name of the body managing and directing the London Hospital at Whitechapel subsequent to that time was '' The Board of Governors of London Hospital ''. There were no marked changes in the actual conduct of the hospital and no marked changes in the personnel in charge thereof on July 5, 1948, except that a new governing body was installed which included among its members a number of the members of the former governing body.

There has been no question raised as to the identity of the particular hospital institution intended by the decedent. She did not refer to it by its technical corporate name and apparently was not familiar with the technical corporation organization of the governing body of that hospital, for she directed that the income should be used as '' the board of managers or directors may deem advisable ''. The identity of the individual members of the governing body of a perpetual charitable corporation will inevitably change, and obviously the testatrix did not intend

that the technical title or identity of the governing body of this hospital should determine the validity of this legacy.

The first question which is presented to this court is: Was this gift to the London Hospital one which vested upon the death of Eliza Lillian Ablett or would it vest upon the date of the death of her stepbrother, James Vincent, which occurred subsequent to the effective date of the National Health Service Act?

There have been many decisions pertaining to the subject of vesting. It is well established under the laws of this State that the courts favor the vesting of estates. In *Matter of Watson* (262 N. Y. 284, 300), Judge CRANE stated: " The law favors the vesting of estates, and, unless a contrary intention is unequivocally expressed, it will not be imputed." In *Connelly* v. *O'Brien* (166 N. Y. 406, 408), the court said: " The construction to be given to the instrument does not depend, however, upon grammatical rules or any close analysis of the language employed, but upon settled principles applicable to all wills. A remainder is not to be considered as contingent in any case where it may fairly be construed to be vested, since the law favors the vesting of estates. The adverbs of time, therefore, such as *when, then, after, from* and *after*, etc., in a devise of a remainder limited upon a life estate, are construed to relate merely to the time of the enjoyment of the estate and not to the time of its vesting in interest."

In *Lewis* v. *Howe* (174 N. Y. 340, 346), the court stated as follows: " It is elementary law that the courts should adopt that construction, whenever possible, which will avoid intestacy and which is most favorable to the vesting of the estate devised, and which will avoid the disinheritance of the remainderman who happens to die before the termination of the life estate. These rules are so familiar and so well settled that it is quite superfluous to cite authorities to support them."

Counsel for the distributees of Eliza Lillian Ablett and for the four other remaindermen strongly urge that the legacy did not vest in the London Hospital and base their contention primarily upon the " divide and pay over " rule. This rule has been applied where the remainder is a gift to a class or a group of persons where the precise identity of the individual beneficiary is to be determined by some event subsequent to the death of the testator. There are many cases which hold that if the remainder gift is to a specifically named individual, the divide and pay over rule of construction should not apply. In *Matter of Staats* (272 App. Div. 139, 141), later affirmed by the Court of

Appeals (297 N. Y. 648), the Appellate Division, Fourth Department said: " The Surrogate's conclusion is based, primarily, on the application of the so-called ' divide and pay over ' rule, announced in New York decisions, of which *Dickerson* v. *Sheehy* (156 App. Div. 101, affd. 209 N. Y. 592), *Matter of Lamb* (182 App. Div. 180, affd. 224 N. Y. 577), and *Matter of Curtis* (252 App. Div. 256, affd. 278 N. Y. 589), are typical. This rule, however, is not rigid and is subject to exceptions. It is usually applied where the remainder is to be paid to a class, the membership of which cannot be determined until the happening of a future event. Here, the remainderman is named, which is a feature operating against the application of the rule. Again, it is fundamental that the law favors treating remainders as vested rather than contingent (*Connelly* v. *O'Brien,* 166 N. Y. 406, 408).''

Section 40 of the Real Property Law provides: " A future estate is either vested or contingent. It is vested, when there is a person in being, who would have an immediate right to the possession of the property, on the determination of all the intermediate or precedent estates. It is contingent while the person to whom or the event on which it is limited to take effect remains uncertain.''

In this case there is a specifically named legatee in existence which had the immediate right to possession on the date of Mrs. Ablett's death, subject to the right of James Vincent to the life income, and all that was postponed was the right of enjoyment; it appears to be clearly under section 40 of the Real Property Law.

The court must look at the meaning of the instrument and not mere technical verbiage alone. (*Connelly* v. *O'Brien, supra.*) The mere use of the words " divide and pay over " does not necessarily determine that it was the intention of the decedent that vesting should be postponed. Looking at the entire instrument and the specific designation of residuary legatees set forth therein, it would appear that it was not the intention of the testatrix to postpone the vesting, and the divide and pay over rule does not apply in this case. As the court stated in *Fulton Trust Co.* v. *Phillips* (218 N. Y. 573, 583) : " The so-called ' divide and pay over rule ' is a canon of construction rather than a rule of property, and like other rules, which are applicable in the interpretation of wills, it is always applied in subordination to the intention of the testator which is expressed in the will.''

In *Matter of Embree* (9 App. Div. 602, 605), affirmed on the opinion of the court below (154 N. Y. 778), the court said:

" That even though there be no other gift in the will than that contained in a direction to pay or distribute in the future, yet if such payment or distribution appear to be postponed for the convenience of the estate only (as to let in some intermediate estate), the ulterior legatees will take a vested interest at the death of the testator."

In the briefs filed herein it has been repeatedly urged that the case of *Wright* v. *Wright* (225 N. Y. 329, 333), is directly in point and indicates that the divide and pay over rule would prevent vesting in this case. The present case differs from *Wright* v. *Wright* (*supra*), in several important particulars. In that case there was a direction to the executors " to pay and deliver to the Washington Heights Library, in the City of New York, upon the condition that it shall be maintained ". There is no condition of any kind attached to the legacy contained in Mrs. Ablett's will. However, in *Wright* v. *Wright* (*supra*), the Court of Appeals for other reasons did affirm the judgment which directed the payment of the legacy to the New York Public Library, a successor corporation to the Washington Heights Library performing similar functions. The *Wright* case has been distinguished as far as the divide and pay over rule is concerned in *United States Trust Co.* v. *Taylor* (193 App. Div. 153, 159, affd. 232 N. Y. 609), wherein the court said: " The estate in the *Wright* case was contingent upon a condition that ' it (the library) shall be maintained at all times as a free circulating library.' Such a bequest was clearly conditional and did not come within the definition of a vested estate as stated in section 40 of the Real Property Law ".

The question of vesting is determined by the laws of the State of New York, but it appears to be the well-settled law in this State that the laws of the domicile of the beneficiary control in determining whether or not the foreign trustee is competent to take the gift and administer it for the purposes expressed. (*Hope* v. *Brewer*, 136 N. Y. 126; *Matter of Merritt*, 273 App. Div. 79; *Matter of Idem*, 256 App. Div. 124, affd. 280 N. Y. 756.)

The provisions of the National Health Service Act of 1946, specifically provide that all endowments held before the appointed day by a voluntary hospital designated as a teaching hospital (of which the London Hospital is one) shall be transferred to and vest in the board of governors of such hospital.

An examination of the English cases cited in support of payment to the London Hospital indicates that the same results, as far as the public is concerned, will be achieved by payment to the board of governors of London Hospital under the National

Health Service Act as were intended by the testatrix. In *Matter of Hunter* (All E. R., Jan. 6, 1951, Vol. 1, p. 58, 59), the court stated as follows: '' The passing of the National Health Service Act, 1946, undoubtedly made a great and radical change from some points of view in the position of hospitals in general and this infirmary and dispensary in particular, but, although from many points of view the change was fundamental, from the point of view of an ordinary layman interested in the healing and care of the sick in the district in which he lived — the testator in this case lived in South Shields — and from the point of view of a man who was desirous of commemorating his deceased father in conjunction with a place where such munificent work was carried on, I do not think the difference is very great. There was undoubtedly at one time a feeling that the passing of the National Health Service Act, 1946, made a clean break with the past and that hospitals and dispensaries in the future were not to be like those in the past, but, from many points of view, that is a completely fallacious idea. Although counsel have pointed out grave differences from the administrative point of view — and from the point of view of the ownership of the property of these charities the change is a fundamental one — I do not think from the point of view of the testator making a gift of this kind that there is such a difference as would justify me in saying that there is no object of his bounty or that his gift has failed.''

Gifts made to English hospitals prior to the passage of the act and not paid prior to that time have been upheld and are regarded under the laws of England as charitable bequests, and the presently existing corporations are regarded as proper parties to receive such gifts or bequests. In *Matter of Frere* (All E. R., Aug. 5, 1950, Vol. 2, p. 513, 516), the court stated: '' and having regard further to the two recent cases of *Re Morgan's Will Trusts* (1), and *Re Dean's Will Trusts* (2) it is not open to me to hold in the present case that this is not a good charitable disposition of the residuary estate. The fact that the hospital is still to be regarded as a charity seems to me implicit in the reasoning of ROSBURGH, J., in *Re Morgan's Will Trusts* (1), and, further, it appears to me that, in *Re Dean's Will Trusts* (2), HARMAN, J., has, in effect, held that a hospital does not cease to be a charity merely because of the coming into effect of the National Health Service Act.''

Testimony was presented by an English solicitor familiar with the National Health Service Act and the decisions thereunder, who testified that the board of governors of London Hospital was qualified to take the legacy and under the laws of

Great Britain would be entitled to the legacy and could properly carry out the directions contained in the legacy. No expert testimony was presented to contradict this, and there was no proof that the legacy would not be properly administered by the board of governors of the London Hospital and that the people of the district of Whitechapel would not be benefited by such gift through increased facilities or services on the part of the London Hospital.

An examination of the National Health Service Act would indicate that it was the intention of the English Government that such legacies should be given to the successor governing boards and should be utilized for the purposes intended. In *Matter of Bawden* (All E. R., Nov. 26, 1953, Vol. 2, p. 1235, 1240), the court said: "The object of the section is simply to provide that the funds applicable to a hospital shall continue to be so applicable after the operation of the National Health Service Act, 1946, and provides for the body which takes the place of the former hospital (in whichever class it may fall) continuing the services in question."

In previous cases of this kind in this country, much emphasis has been put upon the statement that "any sums paid to a regional hospital board or board of management pursuant to the last foregoing subdivision shall, *so far as practicable*, be applied by them for the purposes specified in the trust deed ". It would appear to this court that the words " so far as practicable " were not words which were intended to release funds from the use for which they were given, but rather were words of direction, directing the boards to comply with all trust agreements so far as practicable and possible. In *Matter of White* (All E. R., March 10, 1951, Vol. 1, p. 528, 530), the court held with reference to a bequest to an English hospital: " Having decided that this gift is charitable, the question arises whether it should be paid over to the first defendants, the board of governors of the group of hospitals of which the Royal Infirmary, Sheffield, is one, or whether it fails because it is impracticable, or whether, if it is not impracticable and it should be paid to the first defendants, there ought to be some scheme for the regulation of the charitable object indicated. As to impracticability, it is for the next of kin to show that, and I think it is manifestly true to say that they have not shown it."

The testimony of the expert witnesses of the London Hospital indicates clearly in this case that the use in accordance with the wishes of the testatrix is practicable, and the board of governors of London Hospital has offered to give an undertaking to guar-

antee that these funds will be used for the benefit of the London Hospital as further proof of such fact. Therefore, the statutes of England as enacted and interpreted by the courts of England clearly indicate that the board of governors of London Hospital is the successor to the vested interests of the governors of London Hospital and can and should under the laws of England comply with the terms of the trust created by Mrs. Ablett, and the guarantee offered by the governing board of that hospital will prove that it will comply with the terms of such trust.

It has also been urged by counsel for other remaindermen that the legacy to the London Hospital was void because of vagueness and would be incapable of administration. This position is untenable for them, inasmuch as all parties concerned have conceded that the other four portions of the remainder were to go without question to the charitable institutions therein named; however, these institutions received the legacies given each of them with the same direction for administration. If one is incapable of administration, all would be incapable of administration and all would fail; or if the others are capable of administration, then also is this.

It would appear that the legacy given to the London Hospital under the last will and testament of Eliza Lillian Ablett vested upon the date of her death; and upon the proof herein presented, including the guarantee to be filed by the board of governors of London Hospital, it would appear that under the laws of England the board of governors of London Hospital can and will see to the proper application of these funds and therefore will be entitled to the legacy. This decision of this court is dependent upon the filing of a suitable guarantee by the board of governors of London Hospital, as previously offered by such board. The failure to file such undertaking would in effect amount to a statement by the board of governors of London Hospital that it could not or would not comply with the terms of the trust.

In the event of the failure to file such undertaking, this court can well give serious consideration to the doctrine of cy pres. Our courts make a definite effort to sustain a charitable bequest, and that this is the policy of this State is apparent by the provisions of section 12 of the Personal Property Law, which includes the cy pres doctrine and which goes so far as to compel the Attorney-General of this State to appear in support of the validity of contested charitable bequests.

In determining the applicability of the cy pres doctrine it is necessary to determine first, assuming that this legacy is void or lapsed, if there is an alternative bequest of the funds to

which the London Hospital would otherwise be entitled or if the decedent died intestate as to these funds. In that connection it has been urged that there is an alternative bequest because of a clause in the will, following all legacies including clause Seventeenth, directing that " in case any of the specific legacies mentioned herein shall lapse or become void, I direct that such become a part of my residuary estate ".

There were, in addition to the residuary legacies, a number of other legacies. It is urged that inasmuch as the above statement follows clause Seventeenth it includes the residuary legacies contained in clause Seventeenth. However, residuary legacies are not specific legacies. In the technical sense, specific legacies refer only to specific items or property bequeathed to specific persons. In this particular case, however, it may well have been that the decedent intended to refer to the bequests of specific sums of money as " specific legacies ", but to construe this clause as covering the residuary legacies as well would be to take from the word " specific " all meaning, for such a construction would then cover every legacy in the will. If the decedent had not intended to eliminate from the effect of this sentence at least some of the legacies of her will, there would have been no reason to insert the word " specific "; a statement " in case any of * * * legacies herein mentioned shall lapse * * * " would have been clear and unequivocal. We must give some meaning to the use of the word " specific ", and if it has any meaning whatsoever, it must have been the intention of the testatrix to eliminate at the very least the residuary legacies from the effect of this statement. This court has no power to ignore the use of the word " specific " by the testatrix. As Judge CARDOZO said in *Matter of Buechner* (226 N. Y. 440, 443) : " Words are never to be rejected as meaningless or repugnant if by any reasonable construction they may be made consistent and significant. Excision is a ' desperate remedy ' (*Adams* v. *Massey,* 184 N. Y. 62, 69). It is ' only a last resort, to be availed of when all efforts to reconcile the inconsistency by construction have failed '. (*Van Nostrand* v. *Moore,* 52 N. Y. 12, 20). Here we perceive no conflict, and surely none that is inevitable."

The statement that " specific legacies " which lapse should become a part of the residuary estate is not applicable to the legacy of the London Hospital, and therefore there is no alternative bequest of this legacy.

If the remaining beneficiaries under clause Seventeenth of the will do not take as alternative beneficiaries because of the particular phraseology of the will just discussed, the question

arises — is this lapsed legacy part of the residuary estate and. do they take as residuary legatees? The law in this State seems established that there shall not be a " residue of a residue ". This matter was clearly discussed in *Wright* v. *Wright* (225 N. Y. 329, 340–341), repeatedly cited by counsel herein. In that case the court said: " In such a case, on failure of the intended legacy of part of the residuum, the part as to which disposition has failed will go as in the case of intestacy and the residuum passing under the residuary clause will not be augmented by a ' residue of a residue ' * * *. However; without attempting to justify this distinction as logical or reasonable in most cases we nevertheless are forced to realize that as the result of inheritance and frequent repetition the rule has become too firmly established to be disregarded."

In the light of the foregoing, if the legacy did not vest, the decedent would have died intestate as to this amount, and the court would have the right to avail itself of the doctrine of cy pres. It is the well-established policy of the Surrogates' Courts of this State to effectuate the wishes and intention of the decedent so far as possible. An examination of the will of Mrs. Ablett discloses that her entire residuary estate was to be used for charitable purposes. In addition, there were outright bequests to charities, totaling nearly $100,000. The only obligation she apparently endeavored to assume towards her family was to protect her stepbrother during his lifetime, which she did adequately and amply through the trust established for his benefit. Beyond that and a few small bequests to friends, her entire estate was left to charity, which obviously must have been her moving intention.

She had been a patient at the London Hospital in Whitechapel when she was a young woman and had lived in that section. She was not familiar with the nature or character of the governing body or the official corporate name of the institution, so it could not have been the policy of any management, corporation or particular governing body which motivated her bequest to that hospital. Rather, it must have been that she intended to benefit in some way the health and well-being of the residents of Whitechapel, her former home, and to benefit the institution in which she had been a patient. The buildings and services rendered by the London Hospital still exist. As far as the patients are concerned, they receive similar treatment in the same buildings without charge, and much of the same personnel is utilized for that purpose. (*Matter of Hunter, supra.*)

The evidence on behalf of the hospital shows that as a teaching hospital the powers of the board of governors are such that the funds can be kept as an endowment and will be used to increase research and to provide facilities which otherwise would not exist. The board of governors has offered to give an undertaking to guarantee that the wishes of the testatrix will be complied with. While there may now be technical differences in the organizational setup, nevertheless there could be no closer approximation of the wishes and intent of this decedent, which were to benefit medically the people of that area, and this court would feel constrained to give the most serious consideration to giving the legacy to the board of governors of the London Hospital under the doctrine of cy pres. Before the doctrine of cy pres would be invoked, however, the court would feel compelled to again insist that an undertaking or guarantee be filed by the board of governors of London Hospital, guaranteeing that the funds would be used for the purposes intended by the decedent.

There have been three cases cited which have been decided in this country under the National Health Service Act. Surrogate COLLINS, in *Matter of Bishop* (206 Misc. 7), has determined that funds given to the Dunfermline and West Fife Hospital of Dunfermline, Fife, Scotland, vested on the date of the death of the decedent and should be paid to the present managing board of that hospital. In the case of the *First Nat. Bank of Chicago* v. *King Edward's Hosp. Fund for London,* the Superior Court of Cook County directed the payment to the governing board under the doctrine of cy pres. The third case — *Pennsylvania Co. for Building & Trusts* v. *Board of Governors of London Hosp.* (79 R. I. 74), is the only one cited which has not directed payment to the governing board of an English or Scottish hospital because of the effect of the National Health Service Act. That case, however, is entirely different. The English hospital was not the named beneficiary of the decedent but was a charitable institution selected by the executors of the decedent after the date of the death of the testator; there could not possibly have been any vesting upon the date of the death of the testator. Further, the will specifically provided an alternative beneficiary in the event of the failure of any of the bequests, which would preclude the possibility of the application of cy pres.

It would appear from the proof herein presented that under clause Seventeenth of the last will and testament of Eliza Lillian Ablett that the words " for such purposes " as applied to the legacy given to the London Hospital were intended to include facilities, services, research or other purposes benefiting the

patients of the London Hospital. The undertakings previously filed by the board of governors of London Hospital are deemed by this court to be inadequate for the reason that both refer to the proper application of the funds " for the time being ".

Upon the filing of a suitable undertaking with this court by the board of governors of London Hospital within a reasonable time, guaranteeing that the property received by such board under the provisions of the last will and testament of Eliza Lillian Ablett which represents distribution of principal will be invested and reinvested and retained as a separate endowment fund to be known as the Robert Ablett Memorial Fund, and the income from such fund and investments will be applied for research, services and facilities or other purposes benefiting the patients of London Hospital, as the board of governors may deem advisable, a decree may be presented settling the account and directing the payment of the moneys given to the London Hospital of Whitechapel, London, England, to the board of governors of London Hospital.